## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **MACKESE WALKER SPEIGHT,** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **v.** | ) | **2:13-cv-8019-RDP** |
| | ) | **2:06-cr-452-RDP-TMP** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

The court has before it Movant's June 7, 2013 Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255. (Doc. #1). On August 29, 2013, Movant filed an Addendum to her Motion to Vacate. (Doc. #3). Pursuant to the court's August 14, 2013 order (Doc. #2), the United States Government filed a Response (Doc. #4) to the Motion and Addendum, arguing that the Motion should be dismissed in its entirety. Although given the opportunity to do so (*see* Docs. #5, 6 & 7), Speight did not filed a response in reply to the Government's arguments. The motion is now under submission. After careful review the court has determined that the Motion to Vacate (Doc. #1) is due to be denied for the following reasons.

**I.      Procedural History (2:06-cr-452-RDP-PWG)** (State charges filed)

During a five-day period in July 2006, Defendants Mackese Walker Speight and Keundre Lerico Johnson ("Defendants") acted in concert to commit a number of armed robberies, including three which were the subject of the pending federal indictment. The following is a brief summary of their criminal activities (both federal and state) in chronological order:

1.    **Subway - Lakeshore Drive - July 26, 2006**

Defendants began their short-lived crime spree on July 26, 2006, when Keundre Johnson perpetrated an armed robbery at the Subway restaurant located on Lakeshore Drive near Wilson Road in Birmingham. Witnesses advised that upon entering the store at approximately 6:10 p.m., a black male wearing a bandana and holding a firearm ordered everyone in the store to stay still. The suspect proceeded to the cash register, where he demanded money from the cashier. Rather than waiting for the employee to hand over the money, the suspect grabbed the cash drawer and fled on foot. As the perpetrator made his getaway, a witness observed three black males running from the sandwich shop and getting into a silver-colored car, believed to be either a Nissan Altima or a Honda Accord. Approximately $465 was taken in the robbery.

On August 4, 2006, Kenundre Johnson provided BPD Detective Gregory Johnson with a post-*Miranda*, written statement. In confessing to this crime, Johnson told police that he had been with "TD" and "Vic" (male juvenile offenders who have not yet been identified) and had used a BB gun that resembles a .380 caliber pistol. Such a weapon was later found inside a silver-colored Toyota Camry driven by Mackese Speight. In a separate, oral statement given to the F.B.I. and Hoover police, Johnson also implicated his cousin, Mackese Speight, in this robbery.

2.    **Pizza Hut Deliveryman - Homewood - July 26, 2006** (Counts One, Two, and Three)

Later that same day, at 9:20 p.m., Mackese Speight called Pizza Hut and, using the name "Smith," placed an order for the delivery of three pizzas to Room 313, at the Ramada Inn on Summit Parkway in Homewood.  At around 10 p.m., Speight drove to the motel in her silver-colored Toyota Camry to await delivery. With her were "TD," "Vic," and her cousin, Keundre Johnson.

Shortly after they arrived, Pizza Hut deliveryman Philip Kariuki pulled into the motel parking lot driving his personal car, a 1995 Geo Metro, that had been manufactured in Canada. Mr. Kariuki exited his vehicle and attempted to find Room 313, without success.[1] As he got back into his car to leave, he was approached from behind by Keundre Johnson, who immediately placed a handgun in his back and robbed him of between $25 and $60. Moments later, Mr. Kariuki noticed a silver-colored Toyota, being driven by a black female, pull up behind him. After ordering the victim to sit in the front passenger seat, Johnson got in and drove off, with Speight and the juveniles following behind in the Toyota.

Driving around the immediate area for a few minutes, Johnson eventually pulled into the parking lot of an office building located on Summit Parkway a short distance from the Ramada Inn. There, he was joined by Speight and the other two suspects, "TD" and "Vic." Mr. Kariuki was then ordered out of his car. As the victim complied, he recalls hearing "the female" direct Johnson to put the man on the ground beside his car. Johnson, in turn, gave the order, telling Mr. Kariuki to lie down and not move or he would put "a 40 in his ass." Johnson then leaned inside the victim's car, grabbed a number of pizzas that were on the seat, got inside the Toyota, and left with the others. Mr. Kariuki later picked out Keundre Johnson's picture from a police photopak.

**3.      CiCi's Pizza - Palisades Blvd., Birmingham - July 27, 2006** (State charges filed)

The next day, at approximately 9:20 p.m., Keundre Johnson walked into CiCi's Pizza, located on Palisades Blvd. in Birmingham (the west Homewood area), and approached the store manager, Jeannie Doss, while she was taking an order from a customer. Johnson produced a black-colored revolver, placed the gun beside Ms. Doss' head, and ordered her to, "Open the mother

---

[1] There is no Room 313 at that motel.

fucking drawer!" Ms. Doss stated that after she complied with Johnson's demand, he grabbed the cash register drawer and ran from the store. He then jumped into Speight's car, and rode off in the direction of Columbiana Road. Approximately $300 was taken in this robbery.

     **4.**     **Subway - Old Springville Road, Pinson - July 28, 2006** (State charges filed)

The following day (July 28), Johnson and Speight robbed yet another store. This time, they hit the Subway restaurant on Old Springville Road in Pinson. Witnesses state that at approximately 5 o'clock that afternoon, two black men wearing ski masks and carrying handguns walked into the shop and approached Trevor Hodge, an employee. Mr. Hodge was standing behind the cash register at the time. The bigger of two perpetrators, later determined to be Keundre Johnson, placed a handgun to Mr. Hodge's head and demanded that he open the cash register. When Mr. Hodge failed to respond immediately to Johnson's demand, Johnson struck the victim in the head with his gun. Seconds later, Mr. Hodge opened the drawer. When he did, Johnson grabbed the drawer and, together with his accomplice,[2] ran outside and got into a car being driven by Mackese Speight. As the robbers made their getaway, Johnson fired a shot at a pedestrian, Jiaq Qiang Mei, who was standing outside the restaurant looking in their direction. Mr. Mei was not injured. Defendants got $378.85 in cash.

     **5.**     **Amy Rogers - Columbiana Road, Homewood - July 31, 2006** (Counts One, Four and Five)

Defendants perpetrated their next robbery on Monday, July 31, 2006. At approximately 4:45 p.m., Speight, Johnson, and a fourth juvenile ("NY") drove in Speight's Camry to the Lakeshore Landing Apartments on Columbiana Road in Homewood. As they proceeded through the apartment

---

[2] Johnson's accomplice ("DN") is a juvenile, who was charged in state court.

4

complex, Johnson spotted University of Montevallo co-ed Amy Holaway Rogers, as she was about to exit her 1998 Nissan Altima, that had been manufactured in Smyrna, Tennessee. Johnson immediately alighted from Speight's car, walked up to Ms. Rogers, and forced her at gunpoint into the passenger seat of her car. Johnson then got behind the wheel and drove off, with Speight and "NY" following in Speight's vehicle.

Leaving the apartment complex, Johnson turned right onto Columbiana Road, and then took another right onto Berry Road. From there, he drove parallel to I-65 until he crested the hill near the Alford Avenue exit. Johnson then turned left onto Shades Crest Road and began winding his way through a residential area.  As he was driving, Johnson pointed his gun several times at Ms. Rogers' head, demanding money from her, inquiring as to the whereabouts of a wooded area, and ordering her to shut up. All the while, Speight and "NY" followed Johnson, shadowing his every turn.

Johnson eventually came to the intersection of Shades Crest Road and Alford Avenue in Hoover. As the car began to slow down, Ms. Rogers unbuckled her seat belt, opened the passenger door, and jumped out. When she did, Johnson shot her one time in the back with a .38 caliber revolver and sped off, leaving her on the side of the road seriously wounded.[3]

Johnson then proceeded another quarter mile until he came to a church parking lot located in Vestavia Hills at the intersection of Alford Avenue and Columbiana Road.[4]  There, he abandoned Ms. Rogers' vehicle, rejoined his accomplices in Speight's Camry, and drove away. Before leaving the area, Johnson directed "NY" to wipe down portions of Ms. Rogers' automobile to eliminate any

---

[3] The bullet entered Ms. Rogers' back and exited her chest.  As a result of the wounds she sustained, Ms. Rogers has undergone at least two surgical procedures, losing both her spleen and one kidney in the process.

[4] The parking lot is used by Shades Mountain Baptist Church and is situated directly across Columbiana Road from the church.

latent fingerprints Johnson might have left behind. (Despite "NY's" efforts, police later discovered Keundre Johnson's fingerprints on Ms. Rogers' vehicle.)

Seconds after being shot, Ms. Rogers flagged down local resident Jeffrey Harris, who immediately came to her aid and called authorities. Police and paramedics later transported Ms. Rogers to UAB Hospital for treatment.

**6.     Crystal Wilson - Ashville Road, Leeds - July 31, 2006** (Counts One, Six, and Seven)

After leaving Vestavia Hills, Speight, Johnson, and "NY" headed toward Leeds, eventually stopping at Melissa's Rainbow Car Wash on Ashville Road. It was then approximately 7:30 p.m. The conspirators pulled in and proceeded to the back of the car wash. There, they came upon a woman named Crystal Wilson, who was directly in front of them vacuuming her car, a 2002 Nissan, Altima.[5] As Speight, Johnson, and "NY" continued to sit in their car, Ms. Wilson became nervous; so, she got back inside her vehicle and began to roll up her window.  When she did, "NY" walked up, asked for directions to the interstate, and pointed a silver-colored gun[6] at her head. He then ordered her to move over to the front passenger seat and got behind the wheel. Once inside the car, "NY" directed Ms. Wilson to give him her credit cards, cash, and cell phone, which she did. He then pulled Ms. Wilson's car forward into one of the self-wash bays and stopped.  Moments later, Mackese Speight, wearing disposable latex gloves and a bandana around the lower portion of her face, opened the passenger door on the driver's side and got in.[7]  Taking the gun from "NY,"

---

[5] Ms. Wilson's car was also manufactured in Tennessee.

[6] Based on post-arrest statements made by Johnson and Speight, Ms. Wilson was held up with a .22 caliber revolver.

[7] Speight's actions were caught on video tape by a surveillance camera.

Speight, too, demanded that Ms. Wilson relinquish all her cash, credit cards, and cell phone, adding that if Wilson screamed or tried to signal anyone, she would shoot her.

Leaving the car wash, "NY" turned right onto Ashville Road and drove a short distance until he came to a church. There, he pulled over and, at Speight's direction, put Ms. Wilson inside the trunk. After driving a little farther down the road, "NY" stopped the car again, removed Ms. Wilson from the trunk, and returned her to the front passenger seat. At that point, Speight ordered Ms. Wilson to lead them to the nearest bank.

A few minutes later, the three arrived at the Compass Bank branch located at 7925 Parkway in Leeds; Johnson, who had been following behind in Speight's Camry, also pulled in. Speight and the juvenile then attempted to access money from an ATM,[8] using Ms. Wilson's PIN; however, when neither attempt proved successful, Ms. Wilson agreed to access the account herself, getting approximately $60 in the process.

By the time Ms. Wilson returned to her car with the money, Speight had momentarily moved to the driver's seat; "NY" was still standing outside. Speight then ordered Ms. Wilson to get back in the trunk. After the defendant repeated her demand, both she and Ms. Wilson got out of the car. Then, as Wilson began to walk toward the rear of the vehicle, she noticed that another bank customer, Tamara Lint, had pulled into the parking lot and was sitting in her car a few feet away waiting to use the ATM. All of the sudden, Speight darted away from the car and headed toward the back of the bank. As Speight walked out of view, Wilson turned to the juvenile and asked if she still had to get inside the trunk.  "NY" merely shook his head, as if to say "no," and quickly followed

---

[8] Both Speight and "NY" were photographed by the ATM surveillance camera.

after Speight.  Ms. Wilson immediately got back in her car, turned it around, and left the parking lot. As she drove off, she attempted, though unsuccessfully, to warn Tamara Lint.

Unaware of what had just happened, Ms. Lint pulled up close to the ATM, exited her vehicle, and got some money. As she returned to her car, Ms. Lint noticed another car, Speight's Camry, driving toward her vehicle. The Camry stopped seconds later, a few feet away from where Ms. Lint was standing. Just then, Speight sprang from the driver's seat and, in a firm, forceful voice, demanded money. Without hesitation, Ms. Lint instinctively said, "No!" She then got back inside the car, started the engine, and prepared to drive away. It was at that moment that Lint noticed a black-colored gun in Speight's hand. Seconds later, as Ms. Lint made her getaway, Speight fired a shot, hitting the victim's vehicle just behind the driver's door. Ms. Lint did not stop, but continued driving until she reached the parking lot of a nearby Wal-Mart, where a security guard assisted her in notifying police.

### A.    Apprehension and Statements

Later that night, a tipster contacted Vestavia Hills Police and identified Keundre Johnson as the person who had shot Amy Rogers. This information was passed on to the Hoover Police and to agents of the Gulf Coast Regional Fugitive Task Force, who found Johnson the next day (August 1) and brought him in for questioning. After waiving his *Miranda* rights, Johnson provided two separate statements, in which he confessed to all six robberies, as well as the attempted robbery of Tamara Lint. In so doing, he implicated his cousin, Mackese Speight, and four juveniles. He also advised police as to the whereabouts of the Taurus .38 caliber revolver that had been used in the robberies. Police later recovered the firearm from the basement of Johnson's grandmother's residence.

That same evening police and task force agents also located and interviewed Mackese Walker Speight. After waiving her rights, she, too, provided authorities with an incriminating statement. Unlike Johnson's account, however, Speight attempted to mitigate her role by claiming she had acted out of fear that her cousin might shoot her if she did not comply with his wishes.

On September 27, 2006, a federal grand jury returned a seven-count indictment against Mackese Walker Speight and Keundre Johnson, charging them with one count of conspiracy to commit carjacking, in violation of 18 U.S.C. § 371, three counts of carjacking, in violation of 18 U.S.C. § 2119, and three counts of using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c).  (Doc. #1).  On October 12, 2006, Speight appeared at arraignment with her retained counsel, Emory Anthony, Jr., and entered pleas of not guilty to all counts.  (Doc. #3). Numerous pre-trial motions were filed by counsel for Speight and promptly decided by the court. (Docs. #4-19, and docket sheet generally).  A trial was set for Monday, February 12, 2007.

## B.      Motion to Withdraw and Plea of Guilty

Four days before trial, on Thursday, February 8, 2007, retained defense counsel filed a motion for leave to withdraw.  (Doc. #52).  The motion was based on the Speight's purported dissatisfaction with his services.  (*Id*.).  The following day, Friday, February 9, 2007, the district court held a hearing on the motion to withdraw.  (*Id*.).  During the hearing, the court conducted a thorough investigation into the reasons for the motion to withdraw.  (*See* Doc. #79).  The court inquired of Speight as to why she wanted Anthony to withdraw.  (*Id*. at 2-3).  The court also spoke with Speight's parents who retained Anthony to represent her.  (*Id*. at 3-11, 19-24).  Further the court quested Anthony as well as the Assistant United States Attorney regarding the issue.  (*Id.* at 11-16).

9

After much discussion, the court cleared the courtroom of all but Speight, her parents, Anthony, and the Marshals (for security) to allow them to discuss whether Anthony should continue to represent Speight.  (*Id*. at 24). After the recess, the court returned and was informed that both Speight and her parents were comfortable with Anthony continuing to represent Speight. Further, the court was informed that Speight wanted to enter a blind plea to the charges against her. (*Id*. at 24-26).  The court held a short recess and then began the change of plea hearing.  (*Id*. at 276-27).

During the plea colloquy with Speight, the following exchange occurred between the court and Speight:

> THE COURT: Miss Speight, have you had adequate time to consult with your attorney concerning the charges that are pending against you?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: All right. Feel you have a good handle on the charges pending against you and the evidence the government would present against you?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And now that you have cleared the air with your lawyer earlier today, are you fully satisfied with the representation and advice he's given you?
>
> THE DEFENDANT: Yes, sir.

(*Id*. at 31).  After thoroughly explaining the maximum penalties Speight could receive as a result of her guilty plea, the court asked Speight the following:

> THE COURT: All right. Has anyone made any promise or assurance to you to cause you to plead guilty today?
>
> THE DEFENDANT: No, sir.

>THE COURT: Has anyone threatened or coerced you in any way to cause you to plead guilty?
>
>THE DEFENDANT: No, sir.
>
>THE COURT: Are you pleading guilty because you are, in fact, guilty of the offenses charged in the indictment?
>
>THE DEFENDANT: Yes, sir.

(*Id.* at 47-48). The court then accepted Speight's guilty plea as to each of the counts and scheduled the case for a sentencing hearing on May 24, 2007.

### C.   Sentencing

Before the sentencing hearing, the probation office issued a Presentence Investigation Report. Speight filed objections to the Presentence Investigation Report on May 24, 2007. (Doc. #56). Some of those objections were resolved before the sentencing hearing, and the others were overruled by the court at the sentencing hearing after hearing testimonial evidence and argument. (*See* Doc. #80 at 78-79).

On May 24, 2007, the district court sentenced Speight to a custodial terms of sixty (60) months as to Count One (conspiracy to commit carjacking), to run concurrently with one hundred thirty-five (135) months as to Counts Two, Four and Six (carjacking). Additionally, the court sentenced Speight to mandatory consecutive terms of eighty-four (84) months, three hundred (300) months, and three hundred (300) months as to Counts Three, Five, and Seven (using a firearm during a crime of violence). Her total sentence was 819 months, or approximately 68 years. Speight did not appeal. At some point following the imposition of her sentence, Speight retained the services of Edward D. Tumlin as her new counsel.

### D.   First Section 2255 Petition (2:08-cv-8016-RDP-TMP)

11

On May 22, 2008, Speight filed a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. In that petition, Speight claimed that her former counsel, Emory Anthony, Jr., was ineffective because he failed to pursue an appeal contrary to her wishes. (*See* Doc. #1). She also argued that her counsel was ineffective because he coerced her into pleading guilty. (*Id*.). After both sides submitted briefs in support and in opposition to the motion (*see* Docs. #2, 5, 8), an evidentiary hearing was held by United States Magistrate Judge T. Michael Putnam on November 5, 2009. (*See* Doc. #11). In an April 26, 2010 Report and Recommendation, Judge Putnam recommended that Speight's motion to vacate be denied, finding that there was "no believable evidence that counsel coerced his client" to plead guilty and that "under the circumstances no rational defense would want to appeal either the conviction or sentence imposed," thereby rendering both ineffective assistance of counsel claims unpersuasive. (Doc. #13). The district court adopted that recommendation on May 24, 2010, and Speight's motion to vacate was dismissed with prejudice. (Doc. #15).

On July 19, 2010, Tumlin sought to withdraw from the case, and his motion was granted. (Doc. #19). Speight next retained the services of Michael Rasmussen, who pursued the appeal of the denial of the motion to vacate on behalf of Speight. On May 23, 2011, the Eleventh Circuit reversed the decision of the district court. The court found that Speight was "entitled to pursue an out-of-time appeal of her conviction and sentence" because "[h]ad counsel consulted adequately with Speight about an appeal, there [wa]s a reasonable probability that Speight would have appealed." (Doc. #25).

### E.       Resentencing and Direct Appeal (2:06-cr-452-RDP-TMP)

To procedurally allow Speight to make a new appeal, on September 13, 2011, the district court reimposed the same sentence. (Doc. #87). The following day, Rasmussen filed a notice of appeal on behalf of Speight. (Doc. #89). Speight appealed both her conviction and her 819-month sentence, alleging that her guilty plea was not entered knowingly and voluntarily and that her sentence was procedurally and substantively unreasonable and constituted cruel and unusual punishment. (*Id.*).

On December 19, 2011, the Eleventh Circuit denied Speight's direct appeal in an unpublished opinion. (Doc. #94). The Court found that her pleas were knowing and voluntary and that the plea colloquy satisfied the requirements of Federal Rule of Civil Procedure 11(b). (*Id.*). The court also found that the sentence imposed was not an abuse of discretion because there were no procedural defects in the process and it was substantively reasonable. (*Id.*). Finally, the court found that Speight's sentence was constitutional as it was not grossly disproportionate to the offenses committed. (*Id.*). Speight filed a petition for rehearing *en banc* which was denied, and the mandate issued on April 16, 2012. (*Id.*).

On April 25, 2012, Speight petitioned the Supreme Court for review. However, her petition for writ of certiorari was denied on June 4, 2012.

### F.       Second Section 2255 Petition (2:13-cv-8019-RDP)[9]

Speight filed the instance motion on June 3, 2013, and supplemented it on August 23, 2013. Speight raises three arguments in support of her current Motion (Doc. #1) to Vacate, Set Aside or Correct Sentence. First, she contends that the court abused its discretion when it denied Anthony's

---

[9] The court notes that this second habeas petition is not considered a successive petition because it is based upon the resentencing of Speight on September 13, 2011.

motion to withdraw.  (*Id*.).  Second, she contends that her appellate lawyer, Rasmussen, rendered ineffective assistance of counsel by failing to pursue the issue of whether the district court abused its discretion in denying Anthony's motion to withdraw on direct appeal.  (*Id*.).  Finally, in her addendum, Speight contends that the district court improperly enhanced her sentences because the indictment did not allege that she brandished a firearm.  (Doc. #3).  The court discusses each argument below.

## II.    Discussion

A federal prisoner may file a motion to vacate his or her sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  It is well settled that "to obtain collateral relief, a prisoner must clear a significantly higher hurdle than would exist on direct appeal."  *United States v. Frady*, 456 U.S. 152, 166 (1982).

### A.    Motion to Withdraw and Ineffective Assistance of Counsel on Direct Appeal

Before the court can address the merits of Speight's first claim, it must first address the threshold issue of whether it is even cognizable in a § 2255 motion.  Speight essentially argues that the denial of counsel's motion to withdraw was so egregious and prejudicial that it violated her constitutional rights to a fair trial and representation by counsel.  (Doc. #1 at 7-9)  Courts have long and consistently affirmed that a collateral challenge, such as a § 2255 motion, may not act as a surrogate for a direct appeal.  *See, e.g., United States v. Frady*, 456 U.S. 152, 165 (1982) (collecting cases). Because collateral review is not a substitute for a direct appeal, the following general rules have developed: (1) a defendant must assert all available claims on direct appeal, *Mills v. United*

*States*, 36 F.3d 1052, 1055 (11th Cir.1994); and (2) "[r]elief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'" *Richards v. United States*, 837 F.2d 965, 966 (11th Cir.1988) (quoting *United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. Unit A Sep.1981)).   Accordingly, as a general matter, a non-constitutional error that may justify reversal on direct appeal does not support a collateral attack on a final judgment, *Frady*, 456 U.S. at 165, unless the error (1) could not have been raised on direct appeal and (2) would, if condoned, result in a complete miscarriage of justice.  *Stone v. Powell*, 428 U.S. 465, 477 n. 10 (1976).

Here, Speight contends that she was "deprived of a fair trial due to the fundamental denial of counsel when the District Court essentially compelled her to enter a guilty plea with the representation of ineffective counsel." (Doc. #1 at 7).  She argues that the district court abused its discretion when it denied counsel's motion to withdraw.  (*Id*. at 7-9).  When stripped to its bare bones, Speight's claim is one that could have been raised on direct appeal.  Putting aside other logical flaws in the argument (which are addressed below), her claim challenges a discretionary decision made by the court on the eve of trial.  It does not implicate jurisdictional or constitutional issues, and, therefore cannot be addressed via § 2255.  For this reason alone, her first claim has no merit.

Even if the court accepted Speight's characterization of her claim as one rooted in the Constitution and cognizable in a § 2255 motion, that claim would fail because of the procedural default rule.  Under the procedural default rule, a defendant generally must advance an available challenge to a criminal conviction or sentence on direct appeal or else the defendant is barred from

15

presenting that claim in a § 2255 proceeding.  *McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001); *Jones v. United States*, 153 F.3d 1305, 1307 (11th Cir. 1998); *Mills*, 36 F.3d at 1055; *Greene v. United States*, 880 F.2d 1299, 1305 (11th Cir. 1989).  This rule generally applies to all claims, including constitutional claims.  *See Reed v. Farley*, 512 U.S. 339, 354 (1994) ("Where the petitioner—whether a state or federal prisoner—failed properly to raise his claim on direct review, the writ is available only if the petitioner establishes cause for the waiver and shows actual prejudice resulting from the alleged violation." (internal quotation marks, punctuation, and citations omitted)); *see also Wainwright v. Sykes*, 433 U.S. 72, 84 (1977) (applying cause and prejudice standard to constitutional claims).  The record is clear that Speight did not raise this issue on direct appeal; therefore, the claim is procedurally barred.

That being said, however, a defendant can avoid a procedural bar only by establishing one of the two exceptions to the procedural default rule. Under the first exception, a defendant must show cause for not raising the claim of error on direct appeal and actual prejudice from the alleged error. *Bousley v. United States*, 523 U.S. 614, 622 (1998); *Mills*, 36 F.3d at 1055; *Cross v. United States*, 893 F.2d 1287, 1289 (11th Cir. 1990); *Greene*, 880 F.2d at 1305; *Martorana v. United States*, 873 F.2d 283, 284 (11th Cir. 1989); *Parks v. United States*, 832 F.2d 1244, 1246 (11th Cir. 1987). Under the second exception, a court may allow a defendant to proceed with a § 2255 motion despite his failure to show cause for procedural default if "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Mills*, 36 F.3d at 1055 (internal quotations omitted but quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

The court can easily dispense with the second narrow exception because there is no evidence whatsoever establishing that Speight is actually innocent.  "This exception is exceedingly narrow

in scope as it concerns a petitioner's 'actual' innocence rather than his 'legal' innocence." *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001) (citations omitted). "'[A]ctual innocence' means factual innocence, not mere legal innocence." *Bousley*, 523 U.S. at 623, 118 S.Ct. at 1611. Instead, the evidence before the court is that Speight is actually guilty of the crimes in that she made statements, under oath, in her Rule 11 hearing confirming that she was pleading guilty because she was, in fact, guilty of the offenses charged, and that she knew what she was doing when she committed the crimes charged in the indictment. (*See* Doc. #79 at 48, 57 in 2:06-cr-452-RDP-TMP).

The court next addresses whether Speight has shown cause and prejudice for not raising this claim on direct appeal. To show cause for procedural default, Speight must show that some objective factor external to the defense prevented her or her counsel from raising this claim on direct appeal and that this factor cannot be fairly attributable to Speight's own conduct. *Smith v. Jones*, 256 F.3d 1135, 1145 (11th Cir. 2001); *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). To show cause, a defendant must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. *Murray v. Carrier*, 477 U.S. at 488. Ineffective assistance of counsel can serve as cause sufficient to excuse procedural default, but to do so, the ineffective assistance claim must have merit. *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000). Speight's claim of ineffective assistance, however, does not have merit.[10]

Where, as here, a district court conducts an inquiry into the merits of a criminal defendant's motion for new counsel, the Eleventh Circuit reviews the district judge's ruling for abuse of discretion. *United States v. Calderon*, 127 F.3d 1314, 1343 (11th Cir. 1997) (citing *United States v. Brown*, 79 F.3d 1499, 1505 (7th Cir.), *cert. denied*, 519 U.S. 875 (1996)); *United States v.*

---

[10] This element of the cause for procedural default directly addresses Speight's second claim.

*Durman*, 30 F.3d 803, 812-13 (7th Cir.), *cert. denied*, 513 U.S. 1120 (1995); *United States v. Allen*, 789 F.2d 90, 92 (1st Cir.), *cert. denied*, 479 U.S. 846 (1986).  In making this determination, the Eleventh Circuit considers several factors, the most relevant of which include the following: (1) the motion's timeliness; (2) the adequacy of the court's inquiry into the motion's merits; and (3) whether the conflict was so great that it resulted in a total breakdown in communication between the defendant and her counsel thereby preventing an adequate defense. *Calderon*, 127 F.3d at 1343 (*citing Brown*, 79 F.3d at 1505).  In addition, the court keeps in mind that "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom [s]he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988).

First, although Speight argues that the motion to withdraw was timely, the record tells a different story.  Counsel filed the motion to withdraw (at Speight's request) on Thursday, February 8, 2007.  The trial was scheduled to begin on Monday, February 12, 2007.  As such, the timing of the motion to withdraw was extremely belated.

Second, the record clearly reflects that the district court heard the reasons for Speight's dissatisfaction with trial counsel.  The court thoroughly discussed with Speight, her parents, and both counsel for Speight and counsel for the government the reasons behind the motion and inquired as to whether there was in fact a true breakdown of communication and trust.   After such discussion, the court allowed Speight, her parents and counsel to talk alone, and when the hearing reconvened, Speight (and her parents) informed the court that they were now satisfied with Anthony continuing in the case as the attorney for Speight.  The court inquired more into this announcement

18

and also revisited the issue in the Rule 11 plea colloquy that followed.  Speight continually confirmed her satisfaction with Anthony.

Given the statements made by Speight both before and during her plea hearing on Friday, February 9, 2007, it is clear that she was satisfied with her attorney at that point, there was no breakdown in the attorney/client communication, and that no one forced her to plead guilty.  These factors, combined with the tardiness of the motion to withdraw clearly show that the court did not abuse its discretion in denying the motion to withdraw.  *See Calderon*, 127 F.3d at 1343.  As such, Speight cannot show "cause" sufficient to raise the procedural bar, *see Bousley*, 523 U.S. at 622, and her first claim is due to be dismissed.

As to her second claim, Speight's appellate counsel, Rasmussen, was not deficient on appeal for failing to argue that the district court abused its discretion when it denied her first attorney's motion to withdraw.  As discussed above, the court did not abuse its discretion in denying the motion.  Any argument that the court did abuse its discretion would have been meritless. Rasmussen's performance cannot be found deficient for failing to raise a claim "reasonably considered to be without merit."  *Alvord v. Wainright*, 725 F.2d 1282, 1291 (11th Cir. 1984). Because Speight fails to establish the first prong of the *Strickland* test, her argument for ineffective assistance of counsel on direct appeal cannot survive and is due to be dismissed.

### B.    Sentencing Enhancement

Speight contends in her Addendum that her sentence was improperly enhanced under Count Three from 60 months to 84 months, in light of the Supreme Court's recent holding in *Alleyne v. United States*, 133 S. Ct. 2151 (2013). (Doc. #3).  In *Alleyne*, the Supreme Court held that "any fact that, by law, increases the penalty for a crime, is an 'element' that must be submitted to the jury and

found beyond a reasonable doubt." *Alleyne*, 133 S. Ct. at 2155.   Speight argues that the constitutional error occurred because the element of "brandishing" under § 924(c) was neither pled nor proven to a jury beyond a reasonable doubt.  (Doc. #3.)  This argument fails.

While the *Alleyne* rule clearly applies to cases pending on direct appeal at the time it was decided, "because it is based on the *Apprendi* rule, *Alleyne's* rule does not apply retroactively on collateral review." *Chester v. Warden*, ___ Fed. Appx. ___, 2014 WL 104150 (11th Cir. Jan. 13, 2014) (unpublished); *see also Dohrmann v. United States*, 442 F.3d 1279, 1281-82 (11th Cir. 2006); *McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001) ("[W]e hold that the new constitutional rule of criminal procedure announced in *Apprendi* does not apply retroactively on collateral review."). Consequently, Speight cannot collaterally challenge her convictions—which became final *before Alleyne* was decided[11]—based on the qualifying nature of her predicate felonies. *See* 28 U.S.C. 2255(h) (applying to new rules of constitutional law "made retroactive to cases on collateral review by the Supreme Court"); *Bryant v. Warden, FCC Coleman-Medium*, 738 F.3d 1253, 1273-75 (11th Cir. 2013) (requiring, among other things, that the new rule announced by the Supreme Court to apply retroactively on collateral review).   There was no error committed in connection with Speight's sentencing enhancement.

## III.    Conclusion

For all the foregoing reasons, Speight's Motion (Doc. #1) to Vacate, Set Aside, or Correct Sentence and Addendum (Doc. #3) are due to be denied.  A separate order will be entered dismissing the case with prejudice.

---

[11] Speight's conviction became final on June 4, 2012, when her petition for certiorari was denied, *see Griffith v. Kentucky*, 479 U.S. at 314, 321 n.6 (1987), and the decision in *Alleyne* was announced on June 17, 2013.

**DONE** and **ORDERED** this _____14th_____ day of July, 2014.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE